GARY M. RESTAINO
United States Attorney
District of Arizona
ANDREW C. STONE
Assistant United States Attorney
Arizona State Bar No. 026543
JAMES R. KNAPP
Assistant U.S. Attorney
Arizona State Bar No. 021166
RAYMOND K. WOO
Assistant U.S. Attorney
Arizona State Bar No. 023050
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona  85004
Telephone:  602-514-7500
Email: andrew.stone@usdoj.gov
Email: james.knapp2@usdoj.gov
Email: raymond.woo@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | CR-20-00165-PHX-JJT |
|---|---|
| Plaintiff, | |
| vs. | **RESPONSE TO DEFENDANT SALTER'S MOTION *IN LIMINE* RE GOVERNMENT'S PROPOSED INSTAGRAM EXHIBITS** |
| John Michael Caruso, et al., | |
| Defendant. | |

Defendant Zachary Salter's motion *in limine* to preclude the United States from using certain videos and photos posted to his Instagram account is without merit and should be denied.  Defendant Salter's Instagram account was a key cog in Defendants' fraudulent scheme.  The social media posts helped entice victim-investors to send Defendants' money by showcasing Defendants' wealth and success.  Indeed, several victims are expected to testify at trial that they relied on Salter's Instagram and decided to "invest" with Zima Digital Assets based, in part, on Salter's social media presence.

1    **I.      Victims Relied On Salter's Instagram Before Investing With Zima Digital**
2            **Assets.**

3            Defendants used social media to help market their "fund" to attract additional
4    victims.  Here is a sampling of victim statements that the United States anticipates will be
5    offered at trial:

6            -    Salter told one victim-investor that the reason Zima was so big was because of
7                 Salter's social media influence.  (Bates 5164.)[1]  Further, the victim-investor
8                 viewed Salter's Instagram, specifically the lavish lifestyle Salter was living, and
9                 believed what Salter told him.  (*Id.*)

10           -    Defendants told one victim-investor that Zima had $1 billion of assets under
11                management ("AUM").  (Bates 5122.)

12           -    The same victim said he saw a cigar case (or humidor) on Salter's Instagram
13                with an engraving that read, "Zima Digital Assets $1 Billion AUM."  (Bates
14                5122.)

15           -    The same victim attended a Zima Halloween party where he believed everyone
16                who attended had invested in Zima.  (Bates 5122.)

17           -    A Zima employee and victim-investor said that many of Defendants' meetings
18                with potential investors were hosted at the house on Invergordon where
19                Defendants lived (the "Invergordon house"), because Defendants wanted to
20                showcase the house as proof of Zima's success and that the company was
21                actually making money (Bates 5128).  (*See* Instagram post at Bates 558 caption
22                "@zimadigitalassets Headquarters" & 568 caption "HQ @zimadigitalassets.")

23           -    A victim-investor met with Defendants at "the castle," (the Invergordon house).
24                (Bates 5029.)  Defendants told this victim-investor that Caruso and Salter were
25                the perfect duo—Caruso handled the trading, while Salter managed client
26                relations, including marketing the company.  (*Id.*)  When this victim-investor

27    ─────────────────
        [1] Rather than identify the individual victim-investors, the United States has cited to
28    the applicable Bates number of the reports where the statements are documented.

reviewed information about the company, she viewed the company's website and Instagram profile. (*Id.*) She and her friends became Zima investors because they were friends with Salter. (*Id.*)

- A victim-investor confirmed that Salter performed all the marketing for Zima. (Bates 5017.) Salter managed Zima's website and would send drafts of website content to this particular victim-investor for review. (*Id.*)

- A victim-investor described viewing Salter's success through Salter's Instagram posts that showed him on private jets, traveling, and driving luxury cars. (Bates 5025.)

These victim-witnesses demonstrate that Salter's Instagram posts contributed to Defendants' ability to defraud victims out of millions of dollars.

The 18 Instagram posts that Salter asks this Court to exclude at trial all relate to Defendants' image as successful and wealthy individuals. Ten of the 18 posts explicitly include references to Zima Digital Assets. For example, in the first video (Bates 548), Caruso and Salter are on a private jet, Salter says "Getting ready for takeoff," and the caption reads "@ZIMADIGITALASSETS." Two of the videos show the Invergordon house; the first (Bates 558) is captioned "@zimadigitalassets Headquarters," while the second (Bates 568) is captioned "HQ @zimadigitalassets." The Instagram posts that don't include an overt reference to Zima Digital Assets, all contain displays of Salter's and Caruso's wealth and success.

- 559 – Salter and Caruso laughing about Caruso damaging a Ferrari
- 556 – Salter showing the trunk of his car packed with Nieman Marcus shopping bags
- 567 – Caruso being driven to a private jet
- 573 – Salter filming Caruso on a luxury yacht
- 1306 – Salter and Caruso at the CNBC headquarters
- 4957 – Cars and private jet set up for Salter's music video

- 3 -

1    -   4957 – Caruso with a Lamborghini and McLaren

2    -   4851 – Caruso sitting in a Ferrari

3    Each of these posts contributed to Salter's marketing efforts on Zima's behalf.

4    ## II.   The Evidence Is Relevant And Not Precluded By Rule 403

5    "The purpose of a motion in limine is to allow the trial court to rule before trial on

6    the admissibility and relevance of certain forecasted evidence." *United States v. Chan*, 184

7    F. Supp. 2d 337, 340 (S.D.N.Y. 2002) (citing *Luce v. United States*, 469 U.S. 38, 41 n.4

8    (1984)). "Evidence should be excluded on a motion *in limine* only when the evidence is

9    clearly inadmissible on all potential grounds." *Wechsler v. Hunt Health Sys., Ltd.,* 381 F.

10   Supp. 2d 135, 140 (S.D.N.Y. 2003).  In considering a motion *in limine*, the court may

11   reserve judgment until trial, so that the motion is placed in the appropriate factual context.

12   *Id.*; *see also Hawthorne Partners v. AT&T Tech., Inc*., 831 F. Supp. 1398, 1400 (N.D. Ill.

13   1993) (A motion *in limine* to exclude evidence should be granted only "when evidence is

14   clearly inadmissible on all potential grounds. Unless evidence meets this high standard,

15   evidentiary rulings should be deferred until trial so that questions of foundation, relevancy

16   and potential prejudice may be resolved in proper context.").

17   Under Rule 403, exclusion of evidence in a criminal prosecution is "an

18   extraordinary remedy to be used sparingly." *United States v. Mende*, 43 F.3d 1298, 1302

19   (9th Cir. 1995).  "[T]he danger of [unfair] prejudice must not merely outweigh the

20   probative value of the evidence, but substantially outweigh it." *Id.*

21   > Relevant evidence is inherently prejudicial; but it is only unfair prejudice,
22   > substantially outweighing probative value, which permits exclusion of
23   > relevant matter under Rule 403.  Unless trials are to be conducted as
     > scenarios, or unreal facts tailored and sanitized for the occasion, the
24   > application of Rule 403 must be cautious and sparing.  Its major function is
     > limited to excluding matter of scant or cumulative probative force, dragged
25   > in by the heels for the sake of its prejudicial effect.

26   *United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000) (quotations omitted).

27

28

- 4 -

Here, the evidence could be viewed as prejudicial, in that it tends to prove that Defendants' operation of Zima was fraudulent.  *See United States v. LeMay*, 260 F.3d 1018, 1026 (9th Cir. 2001) ("All evidence introduced against a criminal defendant might be said to be prejudicial if it tends to prove the prosecution's case.").  That, however, isn't the standard for preclusion.  *Id.* (Rule 403 excludes evidence without any relevance or if the potential for prejudice "far outweighs what little relevance it might have").  Salter's Instagram posts are highly relevant and do not approach the high standard for exclusion under Rule 403.

Each of the Instagram posts helped bolster Defendants' image as wealthy and successful in order to entice additional victims into the fraud.  Of course, these Instagram posts by themselves do not prove Salter's guilt.  At trial, the United States will introduce evidence related to Salter's misrepresentations, including, among other things, the pitch deck he created for Zima.  This pitch deck (Bates 5025), which Defendants often provided to prospective victim-investors was littered with false statements, including the following examples.

- A "performance timeline" that purports to show Zima's five year return on investment dating back to 2014, when in reality, Salter and Caruso created the company in 2018.
- Claiming that "Zima Digital Assets flagship high-frequency trading strategy has a 5-year track record."  And, "Zima Digital Assets claims compliance with the SEC and FINRA."
- Suggesting that "[p]ortfolio managers at Zima Digital Assets have been investing in long and short strategies since 2012."
- Stating that Zima had $1 billion in assets.
- Discussing Zima's "global operations" that included a "talented team of analysts that are geographically positioned in New York City, London and Hong Kong."

Beyond Salter's misrepresentations on the pitch deck, he made similar misrepresentations in conversations with victim-investors.  (*See, e.g.,* Doc. 30 at ¶ 12 ("But Iv [sic] got a team of 7 analysts and 2 executive traders managing my crypto hedgefund, you wanna make some money let me know I gotchu brother.").)

These misrepresentations are coupled with evidence that Defendants never used the money they received from victim-investors to purchase cryptocurrency *or make any investment whatsoever*.  At trial, the United States will introduce numerous summary exhibits that document that Defendants received over $10 million from victims and then spent that money primarily on luxury items, gambling, and Ponzi payments back to investors.

Contrary to Defendant's argument that the United States will attempt to prove Salter's knowledge of Zima's fraudulent activities through "displaying a high level life style supported by the diversion of investor funds," the United States will prove it through his misrepresentations.  In addition, the evidence will show that Defendants marketed themselves through social and traditional media to attract additional victims.  Throwing a huge Halloween party at their mansion (Bates 4729), for example, was part of their strategy.

The 18 Instagram clips provide highly relevant evidence that helps tell the story of Defendants' criminal conspiracy.  The posts can be viewed as prejudicial, but only because they tend to help prove the United States' case against Defendants Caruso and Salter.  The evidence is not unfairly prejudicial nor is it cumulative.[2]  Defendant's motion should be denied.

---

[2] Defendant argues that three posts involving the Invergordon house are cumulative. (Doc. 188 at 4, 5.)  But these videos are short and showcase different parts of the house. One video (Bates 558) shows the entrance to the house, while a second (Bates 568) captures the backyard and pool, and a third (4729) documents the Halloween party.  None of these videos is longer than 15 seconds. This evidence isn't cumulative.

1

2    Respectfully submitted this 25th day of March, 2022.

3                                                      GARY M. RESTAINO
                                                       United States Attorney
4                                                      District of Arizona

5
                                                        *s/Andrew C. Stone*
6                                                      ANDREW C. STONE
                                                       JAMES R. KNAPP
7                                                      RAYMOND K. WOO
                                                       Assistant U.S. Attorneys
8

9

10

11

12                           **CERTIFICATE OF SERVICE**

13

14        I hereby certify that on March 25, 2022, I electronically transmitted the attached

15   document to the Clerk's Office using the CM/ECF System for filing a copy to the following

16   CM/ECF registrant:

17   David Eisenberg
     Robert McWhirter
18

19    *s/ Andrew C. Stone*
     U.S. Attorney's Office
20

21

22

23

24

25

26

27

28