**quinn emanuel** trial lawyers | washington, dc

1300 I Street NW, Suite 900, Washington, District of Columbia 20005-3314 | TEL (202) 538-8000 FAX (202) 538-8100

WRITER'S DIRECT DIAL NO.
**(202) 538-8330**

WRITER'S EMAIL ADDRESS
**aviperry@quinnemanuel.com**

June 6, 2024

Re:  *United States v. John Caruso*, Case No. 20-CR-00165-PHX-JJT

Dear Officer Leonard:

The defendant, John Caruso, objects to the following provisions of the draft presentence report (PSR) issued on May 23, 2024. ECF 370. The objections set forth in this letter are based in part on Mr. Caruso's information and belief, and are not intended to contradict factual stipulations in the plea agreement or to detract from Mr. Caruso's acceptance of responsibility for his offense.

1. Page 3: "X Listo" is not an alias Mr. Caruso has used.

2. Paragraph 5: The fourth sentence (relating to restitution) should read "all victims directly and proximately harmed" (not "or").

3. Paragraph 6: Please add that the government has agreed to apply the value of forfeited assets towards Mr. Caruso's restitution obligation. *See* Plea Agreement ¶ 8(e).

4. Paragraph 9: It is inaccurate to say that Zima was a "fraudulent company" or that no investor funds were used for cryptocurrency investments. For instance, on April 6, 2019, Mr. Caruso purchased 330.39 Bitcoin (valued at approximately $1.7 million at the time) through Binance.com.

5. Paragraph 10: The first sentence of this paragraph should be revised to include only Mr. Salter, not Mr. Caruso. It is not accurate to say that Mr. Caruso "participated in numerous interviews with various publications to obtain favorable press coverage." The interviews referenced in this paragraph principally involved Mr. Salter, not Mr. Caruso. In fact, the PSR elsewhere acknowledges that "Salter's primary role in the conspiracy was to recruit investors through social media and national media publications." PSR ¶ 18. It is also not accurate to describe the article "Meet the Michael Jordan of Algorithmic Cryptocurrency Trading" as an interview.

quinn emanuel urquhart & sullivan, llp

ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | SINGAPORE | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

6.     <u>Paragraph 11</u>: Similarly, the first sentence of this paragraph should be revised to include only Mr. Salter, not Mr. Caruso. It is inaccurate to attribute false statements made in "various media publications" to Mr. Caruso. As this paragraph makes clear, it was Mr. Salter and Mr. Domine, not Mr. Caruso, who were responsible for publicity through social and traditional media outlets.

7.     <u>Paragraph 13</u>: It is inaccurate to say that Mr. Salter created the pitch deck "based on representations made by Caruso." In fact, Mr. Salter included certain statements in the pitch deck without Mr. Caruso's knowledge and other statements over Mr. Caruso's objection. There is clear documentary evidence that Mr. Caruso repeatedly chastised Mr. Salter for including information in the pitch deck without Mr. Caruso's consent. *See, e.g.*, Exs. A, B (Sept. 19, 2019 text messages from J. Caruso to C.J. Wilson). And multiple witnesses reported to law enforcement that Mr. Salter created the deck. C.J. Wilson stated: "SALTER created a 'deck' for Zima that described the principals of Zima and stated that Zima has been investing for the last six years. Wilson believed the content of the deck were false material representations made by SALTER. SALTER sent this deck to Wilson and told Wilson he was the one who created it." Mar. 12, 2020 investigative report of C.J. Wilson interview at 1-2.[1] Similarly, Arthur Hoffman, Zima's Chief Marketing Officer, reported to law enforcement that "SALTER also told him that he created the Zima brochure and the PowerPoint presentation." Feb. 27, 2020 investigative report of A. Hoffman interview at 2. There is simply no credible evidence, other than Mr. Salter's self-serving statements, that he created the investor pitch deck "based on representations made by Caruso." And in fact, significant evidence undercuts that assertion.

8.     <u>Paragraph 14</u>: Mr. Caruso believes that an accurate financial accounting would not support the statement that the "majority of . . . expenditures were made by Caruso."

    It is clear the government's financial accounting is incorrect and cannot be relied upon. The government calculates restitution (total money received from investors minus total money paid to investors) to be $8,590,909.72. But in fact, the correct amount is $5,039,890. *See* Ex. C at 9 (Expert Report of D. Schwickerath).[2] Based on the restitution amount in Mr. Salter's plea agreement, it appears the government believes Mr. Salter received only $213,903. *See* ECF 297 at ¶ 3. That is demonstrably wrong. Even based solely on an analysis completed by Mr. Caruso's counsel of available records for accounts in Mr. Salter's name, he made over $1 million from the charged scheme. *See* Ex. D (Summary of Z. Salter Expenditures). This analysis almost certainly is underinclusive, as Mr. Caruso's counsel lacks complete account records for Mr. Salter. Because the government's accounting is so plainly flawed, it cannot serve as a basis for any assertion about relative

---

[1] Mr. Caruso is happy to provide a copy of this investigative report, as well as other investigative reports referenced in this letter, upon request.

[2] Given the sensitive nature of the attachments to this report, Mr. Caruso will provide them to counsel and Probation via email.

profits accruing to Mr. Caruso and Mr. Salter (nor any corresponding profit-based evaluation of relative culpability).

9. Paragraph 15: It is not accurate to say that "[e]leven accounts at three domestic financial institutions were opened and utilized to launder the victims' investment funds." In fact, as this paragraph makes clear, 96% of investor funds went into just three bank accounts—two company accounts in Zima's name and a personal account in Mr. Caruso's name. The other eight accounts were used minimally and were not "opened and utilized to launder . . . investment funds."

10. Paragraph 16: The information in this paragraph is not relevant to the offense conduct. The inclusion of this information suggests, incorrectly, that these entities were involved in the offense conduct. The paragraph should be removed.

11. Paragraph 18: As set forth above, Mr. Caruso believes that an accurate financial accounting would not support the statement that Mr. Caruso "profited more from the conspiracy than Salter."

12. Paragraphs 22 to 42: Mr. Caruso disputes the original investment amounts and claimed restitution amounts for certain investors. Mr. Caruso disputes that he directly and proximately caused any losses above the original investment amounts. Mr. Caruso also disputes that he caused the non-economic harms claimed by certain investors.

13. Paragraph 43: Mr. Caruso disputes that the correct restitution amount is $6,390,930.66. He agrees that the Court should order a separate restitution hearing to follow the sentencing hearing. *See* 18 U.S.C. § 3664(d)(5).

14. Paragraphs 47 to 56: Mr. Caruso disagrees with the Guidelines calculation resulting in a total offense level of 30.

    14.1 Sophisticated means: Mr. Caruso disputes the basis for a two-level sophisticated means enhancement. The indicia relied upon in support of this enhancement lack adequate evidentiary support, at least as to Mr. Caruso. For instance, the PSR states that "various social media platforms and national publications were utilized to attract potential investors." PSR ¶ 47. Even setting aside that these media outlets are commonplace in investor solicitations, it principally was Mr. *Salter* (not Mr. Caruso) who was responsible for social media outreach and the contents of other publications. *See id.* ¶¶ 11-12 (describing media outreach conducted by Mr. Salter and Mr. Domine, not Mr. Caruso); *id.* ¶ 18 ("Salter's primary role in the conspiracy was to recruit investors through social media and national media publications"); *see also* U.S.S.G. § 2B1.1(b)(10)(c) (specifying that it must be the defendant, not a co-conspirator, who intentionally engaged in the conduct constituting sophisticated means).

    Similarly, there is insufficient evidence that "[i]nvestor funds were moved into and through a total of 11 accounts to hide the source of the funds." PSR ¶ 47. As the

3

PSR notes, "[n]inety-six percent of all investor funds were deposited into three accounts including two Chase Bank business accounts named Zima Digital Assets, LLC and Zima Global Ventures, LLC, which were registered to both Caruso and Salter, and a US Bank personal account solely in the name of John M. Caruso." *Id.* ¶ 15. That is, substantially all investor funds went into typical business and personal bank accounts in the names of Mr. Caruso and Zima.

Mr. Caruso dealt directly with investors, used only a single company (Zima) and standard corporate and personal bank accounts, and did not fabricate documents. These indicia have been determined by the Ninth Circuit not to support a sophisticated means enhancement. *See United States v. Patterson*, No. 22-10113, 2023 WL 3073103, at *2 (9th Cir. Apr. 25, 2023) (finding abuse of discretion in application of enhancement where defendant "dealt directly with his victim throughout the scheme, . . . did not fabricate documents, coordinate with other parties, transfer funds between different accounts, or otherwise use comparable methods.").

14.2   <u>Substantial financial hardship</u>: Mr. Caruso also disputes the basis for a four-level enhancement for causing substantial financial hardship to five or more victims. It is Mr. Caruso's understanding that the government is *not* seeking this enhancement.

A "substantial financial hardship" is one that is "significant in light of [a victim's] individual financial circumstances." *United States v. George*, 949 F.3d 1181, 1184 (9th Cir. 2020). The evidence here does not rise to that level. The PSR simply relies on the say-so of victim-investors. Nothing more. There has been no effort to verify investors' claims of hardship in light of their individual financial circumstances, such as by comparing investors' actual loss amounts to their overall net worth.

Instead of a four-level enhancement for causing substantial financial hardship to five or more victims, the PSR should apply a two-level enhancement because the offense involved ten or more victims. U.S.S.G. § 2B1.1(b)(2)(A)(i).

The government has filed an objection to the PSR indicating that it believes only 18 levels (not 20) should be added for loss. *See* ECF 380. With that adjustment, and without the substantial financial hardship enhancement (which the government is not seeking), Mr. Caruso's total offense level is 26, and his corresponding Guidelines range is 92 to 115 months. Without the sophisticated means enhancement (which the government likely will seek, but which does not apply), he would have an offense level of 24 and a range of 77 to 96 months.

15.   <u>Paragraphs 58 to 61</u>: The PSR's description of Mr. Caruso's criminal history is inaccurate in a number of respects, most importantly because the PSR repeatedly ascribes to Mr. Caruso conduct by his father. (The two men share a name and were co-defendants in three of Mr. Caruso's prior criminal cases.)

4

16. <u>Paragraph 59</u>: The entire paragraph beginning "In a Maricopa County Adult Probation Violation Report" should be removed because it is unfairly prejudicial and merely reflects the decade-old subjective view of a single probation officer, rather than objective facts underlying a prior conviction. The inclusion of this information—which was not subject to fact-finding by a judge or jury—paints a deeply distorted, unfair image of Mr. Caruso that is inappropriate for inclusion in the PSR. It is hard to imagine a more prejudicial statement, and the inclusion of this information easily could be grounds for a meritorious appeal.

17. <u>Paragraph 74</u>: After his release, Mr. Caruso plans to reside alone in a residence to be approved by the U.S. Probation Office. Mr. Caruso has submitted this information already.

18. <u>Paragraph 83</u>: Please add that, while incarcerated at Central Arizona Florence Correctional Complex (CAFCC), Mr. Caruso has completed 20 different courses. *See* Ex. E (May 6, 2024 Letter from Case Manager Udell). These courses included "cognitive behavioral thinking, education, and addiction management," as well as "life skills based with an emphasis on societal re-entry." Ex. F (May 13, 2024 Letter from M. Rolfsmeier). In fact, Mr. Caruso "has taken all courses available to him both on the tablet system and offered as on unit programming." *Id.*

19. <u>Paragraph 84</u>: Please add that Mr. Caruso has worked two jobs at CAFCC and has not incurred a single disciplinary infraction. *See* Ex. E (May 6, 2024 Letter from Case Manager Udell). Mr. Caruso was employed in one of these jobs "for over 2 years for between 3-6 hours daily;" the other job at CAFCC required "an in-depth classification and risk review" because it entailed "greater access to staff only areas and the exterior of the facility;" and "Mr. Caruso has been disciplinary free the entire length of incarceration." Ex. F (May 13, 2024 Letter from M. Rolfsmeier). And throughout his nearly 53 months in pretrial detention "Mr. Caruso has been respectful to staff and in return staff respect him." *Id.*

20. <u>Paragraph 108</u>: Mr. Caruso disputes that there is a proper basis for an upward departure. The parties' plea agreement fairly reflects an individualized assessment of his culpability, the relevant sentencing factors, and the applicable Guidelines range.

21. <u>Paragraph 109</u>: Mr. Caruso disputes that no basis exists to support a variance. A downward variance is warranted to reflect, among other mitigating factors that the Court must consider under 18 U.S.C. § 3553, (1) the extraordinary duration of Mr. Caruso's pretrial detention (nearly 53 months), (2) the unusually harsh conditions of his pretrial confinement during the COVID-19 pandemic, (3) his incarceration in a massive administrative detention facility as opposed to a minimum security camp (where a similarly-situated post-convicted defendant presumptively would serve a prison sentence), (4) his rehabilitation and exemplary behavior at CAFCC, (5) the need to avoid exacerbating an unwarranted sentencing disparity with Mr. Salter, who has not been detained at *all* and who received a plea agreement under Rule 11(c)(1)(C) with a stipulated sentence of probation. ECF 297 at 2.

As to the need to avoid an unwarranted sentencing disparity, the PSR accurately reflects that Mr. Caruso and Mr. Salter were equally culpable. *See, e.g.*, PSR ¶ 8 ("Caruso and Zachary Salter co-founded and operated Zima Digital Assets"); *id.* ¶ 10-11 (describing Mr. Salter's conduct); *id.* ¶ 18 ("Caruso and Salter engaged in the same course of conduct . . . [B]oth defendants are viewed as average participants"). Neutral witness accounts corroborate the point. Skylar Domine described Mr. Salter to law enforcement as playing a substantial role in the scheme: "When Domine was asked about Zima's website… he said that SALTER created all the content for the website . . . . Domine said that he watched SALTER create the content for the website . . . . Domine said that SALTER handled all the contracts for the Zima investors." *See* July 16, 2020 investigative report of S. Domine interview at 2. And as noted above, C.J. Wilson confirmed that Mr. Salter created the website content and the pitch deck and did all the marketing for Zima. *See* Mar. 12, 2020 investigative report of C.J. Wilson interview at 1-2. So did Arthur Hoffman. *See* Feb. 27, 2020 investigative report of A. Hoffman interview at 2. Mr. Salter also controlled Zima's email account (which was in Mr. Caruso's name), and used it for both business and personal communications. *See* Ex. G (Jun. 30, 2019 Email from C.F. to Z. Salter); Ex. H (Jan. 16, 2020 Email from Geico to Z. Salter). Mr. Caruso and Mr. Salter thus had equivalent, complimentary roles at Zima, with Mr. Caruso running trading operations and Mr. Salter serving as the face of the company and the CEO.

Even acknowledging Mr. Caruso's (decade-old) criminal record, and even assuming for argument's sake that he is *somewhat* more culpable than Mr. Salter (he is not), any slight difference in culpability or criminal history cannot explain the vast gulf between Mr. Salter serving *no* time and Mr. Caruso serving nearly 53 months *already*—much less the 120 months recommended in the PSR.

It is disappointing that the PSR either ignores, or gives scant attention to, these significant mitigating factors. Mr. Caruso respectfully requests that these factors be included as appropriate bases for a downward variance.

22. <u>Sentencing recommendation</u>: Mr. Caruso objects to the recommended sentence of 120 months, which is excessively harsh and would require the Court to reject the parties' plea agreement and reset this case for trial.

As a threshold matter, on May 13, 2024, Officer Leonard and I had a phone conversation in which she advised that she would recommend a time-served sentence, provided that Mr. Caruso could secure suitable post-release housing. It thus was a shock when the PSR then recommended a statutory-maximum 120-month sentence and rejection of the plea agreement.

As set forth above, the recommendation in the PSR is based on a mistaken Guidelines calculation. But more fundamentally, this recommendation ignores critical mitigating facts. There is minimal discussion in the PSR of the impact on Mr. Caruso's development from his father's incarceration, or of his father's role in Mr. Caruso's prior convictions (which drive his Criminal History score). The PSR also omits any meaningful consideration of the

impact of Mr. Caruso's extraordinary pretrial detention during the pandemic. Nor does the PSR even mention that Mr. Caruso has taken every single self-betterment and recidivism-reduction course available to him at CAFCC, and that he has maintained a perfect disciplinary record over his nearly 53 months of pretrial detention. And crucially, the PSR ignores the extreme sentencing disparity that its overly-punitive recommendation would create between Mr. Caruso and Mr. Salter. Accordingly, and to give effect to the parties' plea agreement, Mr. Caruso respectfully requests that the recommendation be revised to reflect the stipulated range of time-served to 84 months of imprisonment.

23. <u>Conditions</u>: Mr. Caruso objects to Standard Condition 8 to the extent it would prohibit contact with his parents, both of whom have at least one prior felony conviction. Mr. Caruso objects to Standard Condition 3 and Special Conditions 2, 13, and 14 as unnecessary and unduly restrictive. Mr. Caruso requests that Special Conditions 4 and 8 be limited to only apply while Mr. Caruso has an unpaid fine or restitution obligation. Mr. Caruso objects to Special Condition 5 as unnecessary given the absence of any history of alcohol abuse or other substance abuse.

Very truly yours,

*/s/ Avi Perry*

Avi Perry (*pro hac vice*)
William Burck (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: (202) 538-8000
Fax: (202) 538-8100
aviperry@quinnemanuel.com
williamburck@quinnemanuel.com
*Counsel for John Michael Caruso*

**CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on this 6th day of June 2024, I caused a true and correct copy of the foregoing letter to be delivered via CM/ECF to all parties.

Dated:  June 6, 2024                /s/    *Avi Perry*
                                          Avi Perry (*pro hac vice*)