**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-20-00165-001-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| John Michael Caruso, | |
| Defendant. | |

Before the Court is Defendant John Michael Caruso's "Emergency Motion for Specific Performance of Plea; Motion to Hold Monthly Payments in Abeyance Until Final Resolution of Restitution/Forfeiture" (Doc. 469). The government has filed a Response in opposition (Doc. 470) and Defendant has filed a Reply in support (Doc. 472). The Court concludes oral argument would not assist at this point in resolution of the Motion on either aspect of the relief requested, and an evidentiary hearing on the request for specific performance would be premature at best; it therefore decides the Motion without oral argument or additional hearing. LRCiv 7.2(f).

**I.    BACKGROUND**

The government obtained an Indictment against Defendant Caruso and his co-defendant Zachary Salter for Conspiracy and multiple counts of Wire Fraud and Money Laundering arising out of their operation of Zima Digital Assets, a vehicle they used to promote and solicit purported investments in various cryptocurrencies. (Doc. 30.) Pursuant to a plea agreement he and the government reached, Defendant eventually entered a plea

of guilty to Count 13 of the Indictment—Transactional Money Laundering in violation of 18 U.S.C. Section 1957. (Doc. 400.) On June 20, 2024, the Court sentenced Defendant to 78 months in custody followed by 36 months of supervised release and a fine of $250,000. (Doc. 406.) Relevant to the instant Motion, the Court also ordered Defendant to pay restitution of $6,260,100 to multiple victims. (Doc. 444.) According to the restitution Order, the terms to which the parties stipulated (*see* Doc. 442), Defendant was to pay the restitution in 34 monthly installments of $191,476.47, commencing 60 days after his release from imprisonment.[1] (Docs. 444, 445.) Also germane to the instant Motion, and pursuant to the terms of the plea agreement between the parties, the Court entered a Final Order of Forfeiture giving the United States clear title to multiple items seized from Defendant in the investigation, to include a total of $925,133.71 in cash and cashier's checks, multiple items of women's and men's designer clothing, shoes, luggage, handbags and accessories; seven works of art; three electronic devices; and 29 pieces of jewelry, mostly very high-end men's watches. (Doc. 449.)

In the plea agreement, the parties agreed that

> [f]orfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this court may impose upon the defendant in addition to forfeiture, except that the United States agrees in good faith to seek approval, to the extent appropriate under the applicable regulations and policy, from the United States Department of Justice Money Laundering and Asset Recovery Section to have forfeited funds applied to restitution.

(Doc. 400 at 8.) This provision of the plea agreement refers to a policy outlined in the Department of Justice's (DOJ) Asset Forfeiture Policy Manual which, under defined circumstances, authorizes a process called "restoration" that would allow assets forfeited from a criminal defendant, once liquidated, to be used to pay restitution to that defendant's

---

[1] The amount included the statutory special assessment of $100 for the single count of conviction, which would be paid first in priority, and the $250,000 fine, which would be paid after all restitution had been paid, according to the terms of the stipulated restitution Order. (Doc. 442-1.)

victims, and credit the value of these payments against that defendant's restitution obligation.

Defendant Caruso completed his sentence of imprisonment and began supervised release on April 30, 2025. Thus, by the terms of the Judgment and restitution Order, his first payment of $191,476.47 was due at the beginning of July 2025. On June 26, 2025, Defendant filed the instant Emergency Motion seeking what he termed "specific performance of the plea [agreement]" and what would amount to a stay on the term of the stipulated restitution Order and the Amended Judgment of Conviction that required him to make the monthly restitution payments.

In the Motion, Defendant argues that, although over a year has elapsed since he was sentenced in this matter, "there is no indication that the government has even started the process of liquidating" the non-cash or check property it obtained through forfeiture, and likewise he has "no indication that the government has sought approval to apply forfeited funds to restitution." (Doc. 469 at 2.) Defendant asserts that while the cash and cashier's checks forfeited are of known value at approximately $925,000, the market value of the physical property items forfeited—the jewelry and watches; designer clothing and accessories; artwork; and electronics—have or may have a market value upon liquidation so substantial that it along with the cash and checks, if applied to the restitution amount ordered, would obviate the need for him to pay any additional restitution. He further argues that no one knows the aggregate market value of these seized non-currency items because the government has taken no action in the last year to either determine the value of those items or to liquidate them. For these reasons, Defendant asks the Court to relieve him of his responsibility to pay the restitution currently scheduled—or any restitution—until 1) the government has liquidated all of the forfeited items; and 2) the government has "act[ed] in good faith to apply the millions of dollars of cash and property the government seized to restitution." (Doc. 472 at 2.)

The government responds that it has not breached the plea agreement and there is no compelling reason to postpone Defendant's restitution payments. (Doc. 470 at 2.) The

government argues first that it has not sought approval from DOJ's Money Laundering and Asset Recovery Section (MLARS) to apply the forfeited funds to restitution because the non-currency assets have yet to be liquidated or disposed of, and MLARS "will generally not accept or approve a restoration request until the liquidation and disposal of the forfeited assets is complete." (Doc. 470 at 3.) Moreover, the government argues that even when that liquidation process is complete, it appears that "the government cannot in good faith make a restoration request to MLARS in light of [Defendant]'s financial situation." In so arguing, the government points to provisions of DOJ's Asset Forfeiture Policy Manual stating that "restoration"—the crediting of forfeited assets against a defendant's restitution obligation—is permissible only where, among other things, the defendant does not have other property available to fully satisfy the order of restitution. (Doc. 470 at 4-5.)

## II.   DISCUSSION

MLARS is the designated decision maker within DOJ on petitions for restoration requests for all judicial forfeitures. USDOJ Criminal Division, Asset Forfeiture Policy Manual 2025 (hereafter "the Manual") at 173. In describing the justification for and parameters of the restoration policy, the Manual provides that

> [b]ecause forfeited assets are the property of the government, courts and defendants lack authority to use them to satisfy defendants' criminal debts, including fines or restitution obligations. However, in many cases, defendants are left with little or no property after the forfeiture is completed. Thus, under the restoration procedures, the Department may forfeit property and transfer the proceeds to the court in satisfaction of the defendant's federal order of restitution. These funds can be applied only to the defendant's outstanding restitution obligation. No portion of the funds can be used to satisfy unpaid fines or assessments.

Manual at 178 (citing to 28 U.S.C. § 524(c); 28 C.F.R. § 9.8(c)). Restoration, where applicable, "is designed to accommodate victims and the courts to the furthest extent possible while still meeting the statutory and regulatory requirements for remission." Manual at 179.

The Manual makes clear that restoration is available to credit forfeited property against a defendant's restitution obligation only when, among other conditions, "other property is not available to fully satisfy the order of restitution." Manual at 178. It explains that

> [b]ecause restitution and forfeiture are mandatory and independent parts of a criminal sentence, the forfeited assets may not be used to satisfy the restitution order if other assets are available for that purpose. Typical examples of this situation might involve corporations that have extensive holdings that are not subject to forfeiture, *or individuals who have property that exceeds the amount subject to forfeiture*.

Manual at 180-81 (emphasis supplied). DOJ enforces this provision by requiring any United States Attorney who submits a request to MLARS for restoration to submit a signed statement representing, among other things, that

> [t]o the best of the U.S. Attorney's, or designee's, knowledge and belief after consultation with the seizing agency, reasonable efforts to locate additional assets establish that the victims do not have recourse reasonably available to obtain compensation for their losses from other assets, including those owned or controlled by the defendants. This is to ensure that restoration does not confer an undue benefit on the defendant.

Manual at 180. Thus in the instant case, the assets forfeited from Defendant may not be credited against his restitution obligation to the victims through the restoration process if he has other assets from which to satisfy restitution. And the government takes the position that based on its current knowledge, it cannot make the above representation because Defendant has ample other assets according to his own repeated representations. The government asserts that Defendant "appears to have substantial assets and ability to pay his court-ordered restitution" because at sentencing, "he 'reported that he had more than $100 million in cryptocurrency and $3 million in public and private stocks' that was not derived from Zima Digital Assets" and only negligible liabilities, and that Defendant continues to make such representations to his probation officer after release from custody. (Doc. 470 at 4-5.)

The government's obligation under the plea agreement, in relevant part, was not to guarantee that that forfeited funds were applied to Defendant's restitution obligation. Rather, it undertook the obligation to "in good faith [] *seek* approval, *to the extent appropriate under the applicable regulations and policy*, from [MLARS] to have forfeited funds applied to restitution." (Doc. 400 at 8 (emphasis supplied).) The government now states that based on Defendant's assertions of wealth, the above-cited regulation and policy render any such request by the USAO for the District of Arizona to MLARS for restoration in this matter inappropriate and thus unsupportable. In light of the information before it now, the Court agrees.

Defendant cannot claim surprise as to the government's analysis or argument. The term of his plea agreement at issue put his prior counsel on notice of the governing policy and regulation issue. And the DOJ Asset Forfeiture Policy Manual detailing all of the relevant policies is widely available. Most law firms maintaining a federal criminal practice have hard copies and DOJ makes it electronically available on its website—the Court was able to find it on-line in less than 30 seconds. *https://www.justice.gov/criminal/criminal-afmls/file/839521/dl?inline=* Its provisions are clear, repetitive, and adamant. And to this purpose of transparency, the policy dictates that AUSAs striking plea agreements that include possible restoration must use the very language the government used in the instant plea agreement, to make clear the limitations on what the local USAO can do regarding crediting forfeited assets to restitution obligations. The Asset Forfeiture Policy Manual states that

> under no circumstances should the criminal AUSA make representations to a defendant or the court that forfeited funds will be used to satisfy restitution through the restoration process. . . . The AUSA may represent in a plea agreement that the USAO will seek MLARS's approval to have forfeited funds applied to restitution, but the AUSAs should *qualify the representation by noting that they will seek such approval only if appropriate under applicable regulations.*

Manual at 179 (emphasis supplied). That is precisely what the government's counsel included in the plea agreement in this matter. There was thus clarity as to the government's obligations and the limitations on those obligations regarding restoration here. As long as the government has reason to believe that Defendant has other assets to pay restitution, it cannot in good faith make the request to MLARS for restoration in this case.

Defendant argues, however, that the government lacks a good faith belief he has additional assets. He points to statements government's counsel made at various points in the prosecution to the effect that Defendant never had assets to cover the investments the victims made with him. (*E.g.*, Doc. 472 at 2.)[2] And he suggests that the Court must bind the government to these statements for purposes of making requests for restoration to MLARS under the DOJ's policy manual. The Court understands Defendant's argument as a form of judicial estoppel.

The Court notes that government counsel have asserted such a belief in this matter, though perhaps less unequivocally than Defendant has argued. (*E.g.*, Doc. 421 at 46 (Sentencing Transcript))[3] In any case, it is not persuaded that such statements would judicially estop the government from taking the position now that Defendant has assets, or would otherwise bind the government to that position. This is true for several reasons.

First, whatever the government's theory of the case may have been, the matter ultimately resolved on a plea of guilty to a single count of transactional money laundering, the elements of which are that: 1) Defendant knowingly engaged or attempted to engage in a monetary transaction; 2) Defendant knew the transaction involved criminally derived property; 3) the property had a value greater than $10,000; 4) the property was, in fact, derived from wire fraud in violation of 18 USC § 1343; and; 5) the transaction occurred in

---

[2] "This Court is aware that Mr. Caruso asserted from the outset and consistently maintained throughout the duration of this prosecution that he did in fact have millions of dollars of crypto assets. He disclosed estimates of his holdings throughout the duration of the case, and again in the pre-sentence report. [] Yet time and time again, the government held fast to its belief that Mr. Caruso was a fraudster who did not have these assets. Notwithstanding Mr. Caruso's consistent assertions, the government has never wavered in its position that he did not have these assets. . . ."

[3] "And I also think it's worth noting that Mr. Caruso purports to have what is apparently massive wealth from other sources. I don't know if that's true. So either he's being dishonest about that or he stole from all of these people despite what would really be substantial wealth."

- 7 -

the United States. 18 USC § 1957. For purposes of the Court's analysis, the relevant element here is Number 4—that the property transacted was derived from wire fraud. But the fraud scheme which the parties agreed had occurred, as set forth in the factual basis of the plea agreement, had nothing to do with whether Defendant had adequate cryptocurrency or other assets to cover the investments his victims put into the scheme. Rather, the misrepresentations underlying the fraud scheme to which Defendant pleaded guilty had to do with the soundness, the staffing, and the level of establishment of the entity that would manage the victims' investments—Zima Digital Assets—and how Defendant would use the money the victims invested. The factual basis reads in whole as follows:

> From April 2018 to January 2020, in the District of Arizona and elsewhere, I, John Michael Caruso, operated a purported cryptocurrency investment fund called Zima Digital Assets. The website for the fund claimed that the company "operated various private funds focusing on investments in cutting edge technologies, including crypto and other blockchain based assets." In addition, contracts between Zima Digital Assets and its investors stated that investor money would be used to invest in digital assets and nothing else. The contracts also specified a guaranteed return on investment.
>
> In order to bring in potential investors, I made, and allowed to be made, certain false statements, including a "pitch deck" sent to investors that falsely claimed that Zima Digital Assets was in "compliance with FINRA" and that it had a "team of analysts that are geographically positioned in New York City, London and Hong Kong." I knew these statements were false. I made, and allowed to be made, similar misrepresentations to potential investors and media outlets, including investors and media outlets outside Arizona. In total, through Zima Digital Assets, I collected approximately $11.5 million in investor funds.
>
> I did not use all of these funds as represented to investors. On or about October 10, 2018, I effectuated the withdrawal of $262,000 from my U.S. bank account ending in -7848 for a cashier's check payable to 1st AZ title. I knew that more than

> $10,000 of the $262,000 was comprised of investor funds obtained through the conduct described above.

(Doc. 400 at 9-10.) Thus, in accepting the guilty plea and the plea agreement, the Court did not at any time rely on any statement by the government that Defendant had no assets beyond what he had taken from the victims in this matter. Nor did the government receive a favorable ruling based on any such statement. And such reliance and benefit or favorable ruling are both necessary elements of judicial estoppel—elements that are missing here as to the government's purported position.

Second, in making his argument that the government should be held to its prior statements, Defendant invites the Court to ignore the fact that throughout this litigation, he has himself repeatedly and vociferously argued—and continues to maintain to this day—that he has more than ample assets to satisfy his restitution obligation fifteen times over, in the form of cryptocurrency account and securities ownership.[4] Defendant made this argument when contesting detention multiple times. He made the argument in his sentencing memorandum and at the sentencing hearing itself. And perhaps most germane for purposes of this analysis, he made this argument to the Court to justify multiple transports from his pre-sentence detention facility to the United States Marshal Service, along with access to computer and data communications equipment, to access those assets in support of his defense.

The Court observes these representations are perhaps most germane to its analysis because the Court did rely on them to grant Defendant multiple favorable rulings allowing the relief requested. Consequently, Defendant's own representations about possessing

---

[4] *E.g.*, Doc. 389, Final Pre-Sentence Report, at ¶ 92: "During the presentence interview, the defendant reported he had more than $100 million in cryptocurrency and $3 million in public and private stocks. He advised this money was not derived from Zima Digital Assets. The defendant conveyed he sold all his properties prior to his arrest for the instant offense, and his bank accounts and vehicles were seized by the government. His liabilities are limited to outstanding legal fees and a total of $7,671 in credit card debt to Capital One Bank and Wells Fargo Bank. He did not report any source of income or monthly expenses due to the length of his presentence incarceration for the instant offense. Despite the substantial amount of restitution owed in this case, it appears the defendant has the ability to also pay a fine considering his significant assets totaling approximately $103 million."

assets worth tens of millions of dollars might well satisfy the judicial estoppel analysis as against him. But the Court finds such a determination is unnecessary to resolution of this issue, as it concludes on this record the government is not bound to any previous assertion that Defendant had no assets or currently has no assets. Thus, the Court cannot conclude at this juncture that the government has breached the plea agreement by failing to in good faith seek restoration of the forfeited amounts to be applied against Defendant's restitution obligation. It therefore will deny Defendant's Motion insofar as he seeks to stay or delay his obligation to pay restitution as scheduled in the amended judgment and restitution order.

Defendant's Motion, however, also raises the question of how long liquidation of assets may take before the government has a complete picture in front of it to make a final determination whether, under MLARS policies, The United States Attorney's Office may request restoration. Defendant takes the position that his entire restitution obligation is just over $6.2 million, and if restoration ultimately is granted, at least $925,000 would be credited to his restitution obligation. And if, as he argues, his non-currency assets upon liquidation yielded $5 million or more, he would have little or no restitution remaining to make.

While the Court judges that hypothetical evaluation highly unlikely, it cannot so conclude with any certainty, because no liquidation has been commenced, let alone completed. Thus, the complete information necessary to even trigger the government's request to MLARS for restoration—assuming it was otherwise appropriate under DOJ policy and regulations—is not yet available. By extension, Defendant would argue that even if the liquidated asset values did not completely satisfy the restitution amount, should restoration be approved by MLARS, the liquidation value once completed could approach his restitution total closely enough that, some months in the near future, Defendant would have satisfied all of his restitution obligation, especially while paying at a rate of over $191,000 per month. In that circumstance, Defendant would argue, undue delay on the part of the government in liquidating the forfeited assets in their entirety prejudices him

particularly. All of this is to say that liquidation must be completed before the parties and the Court know what position each is in to evaluate the government's further obligation, if any, to request restoration.

The Court is persuaded Defendant's position has merit on this point, particularly in light of the fact that 1) the government's asset forfeiture manual clearly states in multiple passages that no request for restoration can be made until liquidation of all assets forfeited by a defendant is complete[5]; and 2) the property at issue has been forfeit for nearly a year as of the date of this Order, and yet the government apparently has taken no action to liquidate the remaining non-currency items. The Court concludes this circumstance works a prejudice against Defendant if the delay in liquidation—and therefore the completion of all information necessary for the United States Attorney to make a final good-faith determination whether he may request consideration by MLARS for restoration—continues for an indeterminate amount of time.

The Court therefore will order that: 1) the United States Attorney's Office shall contact the officials of the United States Marshal Service responsible for liquidation of the remaining property in this matter to obtain schedule by which it is expected to be complete, and then file a notice with that information on the docket; and 2) if the liquidation has not been completed within eight months of the issuance of this Order, upon notice, the Court will reconsider whether there might exist a breach of the plea agreement—a binding contract subject to all of the applicable law of contract, including the attendant duty of good faith and fair dealing as interpreted under Arizona law.

**IT IS ORDERED** denying Defendant's Emergency Motion for Specific Performance of Plea; Motion to Hold Monthly Payments in Abeyance Until Final Resolution of Restitution/Forfeiture (Doc. 469) insofar as Defendant seeks a stay on his obligation to make monthly payments of restitution pursuant to the Final Judgment and Restitution Order.

. . .

---

[5] *E.g.*, Manual at 179 ("MLARS will not accept a restoration request until the liquidation and disposal of the forfeited assets is complete.")

**IT IS FURTHER ORDERED** granting in part and denying in part Defendant's Emergency Motion for Specific Performance of Plea; Motion to Hold Monthly Payments in Abeyance Until Final Resolution of Restitution/Forfeiture (Doc. 469) insofar as it seeks enforcement of the agreement. The government must consult with the United States Marshal Service and file a notice by September 22, 2025, indicating the estimated completion date of the liquidation of the assets forfeited from Defendant in the instant matter.

Dated this 20th day of August, 2025.

Honorable John J. Tuchi
United States District Judge